# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 3743 | **DATE** | Sept. 17, 2001 |
| **CASE TITLE** | Williams Electronic Games    v | | Gregory S. Barry, et all |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 9/26/01, at 9:30 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Memorandum opinion and order entered.
 Accordingly, document #247, #251 and #253 are granted in part and denied in part.
Document #249, #254, #256, #258 and #260 are granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | number of notices | | |
| X | Notices mailed by judge's staff. | SEP 18 2001 | | |
| | Notified counsel by telephone. | date docketed | | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | |
| GDS | courtroom deputy's initials | date mailed notice | | |

FILED FOR DOCKETING
01 SEP 17  PM 4: 00

Date/time received in central Clerk's Office

mailing deputy initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
SEP 1 8 2001

WILLIAMS ELECTRONIC GAMES, INC.,  )
et al.,                           )
                                  )
            Plaintiffs,           )
                                  )        No.    97 C 3743
      v.                          )
                                  )        Judge Robert W. Gettleman
GREGORY S. BARRY, et al.,         )
                                  )
            Defendants.           )

## MEMORANDUM OPINION AND ORDER

Plaintiff Williams Electronic Games, Inc. has brought an eight count third amended complaint against Gregory Barry, its former employee, and Lorna Barry, James S. Garrity, Lawrence J. Gnat, Linda Gnat, Richard S. Slupik, as well as three of plaintiff's former vendors, Arrow Electronics Inc., Milgray Electronics, Inc., and Microcomp Inc., for damages arising out of an alleged fraudulent kickback scheme. Counts I and II, directed against all defendants except Milgray, allege violations of the Racketeer Influence and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961 et seq. Count III, brought against Arrow, Garrity, Milgray, Lawrence Gnat and Slupik, alleges Sherman Act Violations, 15 U.S.C. § 1 et seq. Count IV, against all defendants, alleges state law claims for breach of fiduciary duty and inducement to breach fiduciary duty. Count V, against all defendants, alleges common law fraud and conspiracy. Count VI, alleges violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA"), 815 ILCS 505/1 et seq. Count VII alleges breach of contract and restitution against Barry only, and Count VIII seeks an equitable accounting and constructive trust against all defendants.

All defendants have answered the third amended complaint and have asserted various affirmative defenses. In addition, Milgray has filed a counterclaim against plaintiff, and a cross-claim against Lawrence Gnat, Slupik and Microcomp.

Presently before the court are eight separate motions. For convenience, the court has grouped the motions into three categories: 1) motions regarding or attacking plaintiff's complaint: a) Arrow's motion for summary judgment on RICO, consumer fraud, fiduciary duty, constructive trust and punitive damages; b) Arrow's and Milgray's joint motion for summary judgment on price fixing; c) Milgray's motion for summary judgment on consumer fraud, fiduciary duty, constructive trust and punitive damages and; d) Linda Gnat's motion for summary judgment on all counts directed toward her; 2) motions attacking Milgray's cross-claim and counterclaims: a) Lawrence Gnat's and Microcomp's motion for summary judgment; b) Slupik's motion for summary judgment and; c) Williams' motion for summary judgment; and 3) plaintiff's motion for summary judgment on certain affirmative defenses asserted by the various defendants. As set forth in detail below, the motions are granted in part and denied in part.

**Discussion**[1]

**I. Motions regarding plaintiff's complaint**

    **A. Arrow and Milgray**

        **1. Counts I and II- RICO**

In Counts I and II, plaintiff charges Arrow with violating civil RICO and conspiracy to violate RICO under 18 U.S.C. § 1962(c)(d). Arrow has moved for summary judgment on both

---

[1]The basic allegations of plaintiff's complaint cam be gleaned from the court's previous opinion. Williams Elec. Games, Inc. v. Barry, 42 F. Supp. 2d 785 (N.D. Ill. 1999) ("Williams I"). Familiarity with the facts and the players is assumed.

counts, arguing that plaintiff has no evidence to establish: 1) that Arrow authorized or acquiesced in Garrity's alleged misconduct; 2) a RICO enterprise; or 3) a pattern of racketeering activity.

To establish a claim under § 1962(c), plaintiff must prove: 1) the existence of an enterprise that affects interstate commerce; 2) that the defendant was employed by or associated with the enterprise; 3) that the defendant participated in the conduct of the enterprise's affairs; and 4) that the defendant participated through a pattern of racketeering activity. Williams I, 42 F. Supp. 2d at 790. Arrow challenges all elements, but in particular the requirement that the defendant participate in the conduct of the enterprise's affairs.

In the instant action, plaintiff does not allege that Arrow participated directly in the affairs of the alleged enterprise, but is liable only for Garrity's alleged fraud based on respondeat superior. In Williams I, the court thoroughly reviewed the law on respondeat superior liability under RICO and held that Arrow could be held liable for Garrity's conduct under § 1962(c), but only if Garrity's wrongful acts are: 1) related to and committed within the course of employment; 2) committed in furtherance of the corporation's business; and 3) authorized or subsequently acquiesced in by the corporation. Id. at 792. The court dismissed the RICO counts without prejudice because plaintiff had failed to allege the last element. Subsequently, plaintiff sought and was granted leave to file a third amended complaint adding back the RICO allegations based on facts uncovered during the course of discovery.

Arrow now argues that the little bit of evidence "uncovered" by plaintiff fails in any way to demonstrate that Arrow either authorized or acquiesced in Garrity's conduct. Although the court agrees that plaintiff's case appears thin at best, there are sufficient facts in dispute under

Fed. R. Civ. P. 56 to submit to a jury. As Arrow correctly notes, plaintiff has no direct evidence, i.e., no witness statements or documents, showing definitively that anyone at Arrow knew that Garrity was paying kickbacks to Barry. There is some evidence, however, from which a jury could infer that persons at Arrow were aware that someone at Arrow was paying kickbacks to plaintiff.

Larry Suida, a former buyer for plaintiff, testified that in late 1989 or early 1990, while he was still working at plaintiff, Garrity asked Suida to come in and introduce himself and his line of Arrow products. Garrity gave his sales speech and then said, "two percent of anything you give me goes back into your pocket." The meeting then ended. Suida said that this was the only time he had ever been approached in such a fashion. Suida did not tell anyone at Arrow, but did tell his outgoing purchase manager, Vice President of purchasing, Larry Kesselman, when Kesselman questioned why Suida refused Arrow's business. He did not name Garrity specifically.

Three or four years later in 1994, Suida left plaintiff to work at Capcom, plaintiff's competitor. Capcom was a start-up company at the time and Arrow wanted to do business with it. Arrow sent a four or five person contingent to meet with Suida. Suida told this group that "I was aware of who they were and I was aware of their kickback policy. And it is in the best interest that we just leave it like it is, and I was a little surprised." He was surprised because he got no reaction from any of the Arrow people. He did not specifically mention Garrity or the alleged 2% kickback, or plaintiff when referring to kickbacks, because the Arrow people did not ask. He did, however, have a conversation with the Arrow people about the extremely large

4

amount of business Arrow was doing with plaintiff and how much money Garrity was earning in commissions, expressing surprise that plaintiff was not a "house account."

Although this evidence is slight, a jury could infer from Suida's testimony that people at Arrow knew that Garrity was paying kickbacks to Barry. Arrow is correct that another inference is that Suida was impliedly seeking kickbacks of his own and was unhappy with Arrow's policy against it. A third plausible explanation is that the Arrow people thought Suida was referring to Arrow's policy regarding limits on gifts to buyers. Any of these explanations are possible, but under Fed. R. Civ. P. 56, all reasonable inferences are to be drawn in favor of the nonmovant. Fisher v. Transco Services - Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992). Accordingly, the court concludes that there is sufficient evidence that Arrow ratified Garrity's action to defeat summary judgment.

Next, Arrow argues that plaintiff has not established a RICO enterprise involving Arrow. As Arrow points out, plaintiff's RICO case statement lists three enterprises involving Arrow: 1) the association-in-fact of Barry and Lorna Barry, together with Arrow, Milgray, Garrity, Microcomp, Linda Gnat, Lawrence Gnat, Slupik, Procomponents, Donald Barry, Kathleen Barry, ETAK and APC and its agents and representatives including Harold G. Krause and Michael Iatomasi; 2) Barry, together, with Lorna Barry, Arrow, Garrity, Slupik, Lawrence Gnat, Milgray and Microcomp; and 3) Barry, together with Lorna Barry, Arrow, Milgray, Microcomp, Linda Gnat, Lawrence Gnat and Slupik.

Arrow argues that the evidence shows that these enterprises are nothing more than random lists of defendants, none of which had structure, continuity, hierarchy, differentiation of roles, or a common purpose required of a RICO enterprise. As this court has noted, the hallmark

5

of an enterprise is structure. <u>Williams I</u>, 42 F. Supp. 2d at 793-94 (citing <u>United States v.</u>

<u>Rogers</u>, 89 F.3d 1326 (7th Cir. 1996)). A RICO enterprise is an ongoing structure of persons

associated through time, joined in purpose, and organized in a manner amenable to hierarchy or

consensual decision making. <u>Id</u>. Although there must be some structure to distinguish an

enterprise from a mere conspiracy, there need not be much. <u>Id</u>. The continuity of an informal

association and a differentiation among roles can provide the separate structure. <u>Id</u>.

It is true, as Arrow asserts, that plaintiff has not conclusively established any of the

enterprises identified in the RICO case statement. Plaintiff has, however, provided sufficient

evidence of an association-in-fact between Barry, Garrity and Williams with Barry and Garrity

having diverse roles, and Arrow allowing itself to be sued to perpetrate the fraud and accepting

the benefit thereof. Moreover, there is some circumstantial evidence that Gnat, Slupik and

Milgray may also have joined this enterprise.[2]

Accordingly, the court concludes that there is sufficient evidence to submit to a jury on

whether plaintiff can establish a RICO enterprise involving Arrow.

Finally, Arrow attacks plaintiff's evidence that Arrow engaged in a pattern of

racketeering activity. RICO requires at least two acts of racketeering activity within a ten year

period. 18 U.S.C. § 1961(5). While two acts are required, two acts alone are generally not

sufficient. <u>H.J. Inc. v. Northwestern Bell Telephone Co.</u>, 492 U.S. 229, 237 (1989). The two

---

[2]As noted in the section of this opinion discussing plaintiff's price fixing claim, the
evidence of agreement between Garrity and Milgray (Slupik and/or Lawrence Gnat) was
insufficient to meet plaintiff's burden under § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, of
tending to exclude the possibility of independent action by the defendants. Coupled with the
evidence of Barry's association with Garrity, the evidence is sufficient to create an issue of fact
as to whether an enterprise existed, absent the heightened standard required under § 1.

acts must be related and amount to or pose a threat of continued activity. "In other words a RICO plaintiff . . . must show continuity plus relationship with respect to the alleged predicate acts." Corley v. Rosewood Care Center, Inc., 142 F.3d 1041, 1048 (7th Cir. 1998).

In the instant case, plaintiff has evidence of numerous repeated acts of mail fraud which have the same or similar purposes, results, participants, victims or methods of commission, leaving the relationship prong uncontested. H.J. Inc., 492 U.S. at 237. Instead, Arrow challenges the continuity aspect of the pattern.

Continuity over a closed period may be demonstrated by proof of a series of related predicate acts extending over a period of time. Closed period continuity is analyzed under a five factor test: "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries." Morgan v. Bank of Waukegan, 804 F.2d 970-75 (7th Cir. 1989). Although no single factor is determinative, duration is "the single most important aspect of the closed-ended continuity analysis. Id. at 781.

In the instant case, the alleged scheme lasted almost eight years, and involved thousands of alleged acts of mail fraud consisting of false or overpriced invoices. Despite this lengthy involvement and the enormity of the number of acts, Arrow argues that there is only a single scheme, with a single victim, and a single injury, preventing a finding of continuity. In support of this argument Arrow relies on cases such as Midwest Grinding Co., Inc. v. Spitz, 976 F.2d 1016, 1019 (7th Cir. 1992) and Jones v. Lampe, 845 F.2d 755, 757 (7th Cir. 1988), in which the Seventh Circuit has cautioned against the use of multiple instances of similar acts of mail fraud to find continuity. For example, in Midwest Grinding, the court stated that the number of

7

instances of mail and wire fraud may be "no indication of continuity since the multiplicity of such acts may be no indication of the underlying fraudulent activity. 976 F.2d at 1024-25. In Jones, the court stated that multiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern. 845 F.2d at 757.

In contrast to these cases is Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1300 (7th Cir. 1987), in which Seventh Circuit held that a seven month single scheme which defrauded a single victim established a pattern of racketeering activity because each instance of false billing inflicted an injury separate and independent of the previous and succeeding instances of false billing. "[T]he repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering activity for purposes of civil RICO. Id. at 1305.

In Uniroyal Goodrich Tire Co. v. Mutual Trading Corp., 63 F.3d 516, 524 (7th Cir. 1995), the court analyzed the divergence between the Jones line of cases and the Liquid Air case. The court notes a distinguishing pattern. In the Jones type cases, there was an interdependence amongst the predicate acts and each act was not responsible for a discreet injury. The acts were all necessary to perpetrate a single large fraud. In contrast, in Liquid Air each false invoice on its own deprived the plaintiff of a specific amount of revenue. Each invoice represented a discreet attempt to defraud Liquid Air and had little to do with the previous or subsequent false invoices.

As noted in Williams I, 42 F. Supp. 2d at 795, the instant case is more similar to Liquid Air than Midwest Grinding or Jones. Each separate invoice from Arrow to plaintiff represented an allegedly discreet attempt to defraud plaintiff and had nothing to do with the previous false invoices. Accordingly, the court concludes that there is sufficient evidence of a pattern of

racketeering activity to survive summary judgment. Arrow's motion for summary judgment on Counts I and II is, therefore, denied.

## 2. Count III - Price Fixing

In Count III, plaintiff alleges that Arrow and Milgray have violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.[3] Specifically, plaintiff charges that between September 1994 and June 1996 Arrow (through Garrity) and Milgray (through Gnat and Slupik) agreed to "fix, raise, stabilize and maintain prices of components known as 'eproms.'" Arrow and Milgray have moved for summary judgment on this count, arguing that plaintiff has failed to present evidence sufficient to meet its burden on two of the three elements of its claim.

### a. Standards

A price fixing claim under Section 1 requires proof of three elements: 1) a contract, combination or conspiracy; 2) resulting in an unreasonable restraint of trade in the relevant market; and 3) an accompanying injury. Denny's Marina, Inc. v. Renfro Products, Inc., 8 F.3d 1217, 1220 (7th Cir. 1993). Arrow and Milgray argue that plaintiff has no admissible evidence of a conspiracy or agreement, or a cognizable antitrust injury.

"On a claim of concerted price fixing, the antitrust plaintiff must present evident sufficient to carry its burden of proving that there was such an agreement." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 763 (1984). "To prevail there must be evidence that tends

___

[3]15 U.S.C. § 1 provides in pertinent part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among several States, or with foreign nations, is declared to be illegal.

to exclude the possibility of independent action by the [defendants]. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." Reserve Supply Corp. v. Owens-Corning Fiberglass Corp., 971 F.2d 37, 48-49 (7th Cir. 1992) (quoting Market Force, Inc. v. Wauwatosa Realty Co., 906 F.2d 1167, 1170–71 (7th Cir. 1990) (quoting Monsanto, 465 U.S. at 768)). As emphasized by the Court, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). Therefore, "to survive a motion for summary judgment a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." Id. quoting Monsanto, 465 U.S. at 474. In other words, a non-moving plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inference of independent action." Valley Liquors, Inc. v. Renfield, Importers, Ltd., 822 F.2d 656, 660 (7th Cir. 1987).

Because antitrust law limits the range of permissible inferences as described above, the Seventh Circuit has articulated an analytical scheme to be applied when ruling on motions for summary judgment on price fixing claims. Market Force, 906 F.2d at 1171. The court should inquire:

> 1) is the plaintiff's evidence of conspiracy ambiguous, i.e., is it as consistent with the defendants' permissible independent interests as with an illegal conspiracy; and if so, 2) is there any evidence that tends to exclude the possibility that the defendants were pursing these independent interest. [Id.]

In making this inquiry, the court first examines the plaintiff's evidence of a conspiracy among the defendants. Next, the court examines whether the defendants have offered evidence tending to show that the conduct complained of is as compatible with the defendants' legitimate business activities as with illegal conspiracy. Finally, if, after this examination the court concludes that the evidence of conspiracy is "ambiguous," it must then determine whether the plaintiff can point to any evidence that tends to exclude the possibility that the defendants were pursuing their legitimate independent interests. <u>Reserve Supply Corp.</u>, 971 F.2d at 49.

### b. <u>Analysis</u>

Following this analytical approach, the court examines the evidence of record to determine whether plaintiffs can survive Arrow's motion for summary judgment.

### 1. <u>Evidence of conspiracy</u>

As would be expected, plaintiff has no direct evidence of a conspiracy between Arrow and Milgray. Barry, who was the recipient of the alleged kickbacks, admitted that he had no direct knowledge of any collusion between Arrow and Milgray in general, or between Gnat and Slupik and Garrity specifically. Indeed, all of the individuals involved denied any agreement to maintain prices, or even discussing the topic, with Gnat and Slupik also denying paying any kickbacks to Barry. Interestingly, Garrity invoked his Fifth Amendment privilege against self incrimination when questioned about whether he paid any kickbacks, but explicitly denied any agreement with Slupik and Gnat to set prices or their respective shares of Williams' business. Additionally, Garrity testified that it was Barry who approached him about a kickback scheme rather than the other way around, as asserted by Barry.

Without any direct evidence of conspiracy, plaintiff is left to pointing to a number of circumstantial facts that it argues support an inference that Garrity, Gnat and Slupik conspired to restrain trade in the eprom market by fixing the price and market shares of plaintiffs' business. In particular, plaintiff goes to great pains to suggest the existence of a "joint kickback scheme" between Arrow and Milgray. Arrow and Milgray argue that there is no evidence of a joint kickback scheme and, in any event, the relevant question with respect to Count III is whether there was a "joint price fixing scheme," because a simple kickback scheme does not violate antitrust law.

Plaintiff attempts to establish a conspiracy by setting forth evidence that supports an inference of horizontal price fixing. Plaintiff argues that the record demonstrates that "amidst a sustained period of mutual contact between Arrow's account executive and Milgray's general manager, the two companies implemented virtually identical kickback programs which had the effect of raising and sustaining prices, as well as allocating market share between them by excluding competing quotes." To support this argument plaintiff points to Barry's testimony that he did not "check for competitive prices because, as long as others within Williams did not complain, I was willing to purchase at whatever prices were quoted by the salesmen who were paying me kickbacks." Of course, this testimony is equally as consistent with an independent kickback scheme (or even a joint scheme) as it is with a "conspiracy" to set prices, particularly since Barry admitted he was receiving kickbacks from others besides Arrow and Milgray. Even more important, however, is that Barry repeatedly testified that he did not care about competitive pricing because he got better service from Arrow, and that he would have purchased from Arrow at the same prices without the kickbacks because of that service.

12

Plaintiff also argues that Barry observed circumstantial evidence of collusion. First, Barry testified that Garrity and Gnat excused themselves to keep their conversations out of earshot.[4] The mere opportunity to conspire, however, does not support an inference of conspiracy. "The evidence of informal communications among parties does not unambiguously support an inference of conspiracy." Market Force, 906 F.2d at 1173.

Next, plaintiff argues that Barry's testimony demonstrates that Garrity and Slupik always knew the other's prices even though Barry had not communicated them to the other, that they openly criticized other distributor competitors but not each other, and that Garrity, Gnat and Slupik jointly entertained Barry at sporting events. Plaintiff argues that these "facts" show that Arrow and Milgray maintained a fiction of reasonable pricing and, contrary to their own economic self interest, did not try to undercut each other. Unfortunately for plaintiff, the record is not quite as undisputed as plaintiff suggests. Garrity and Gnat both testified that they never jointly entertained Barry. There is evidence that Garrity and Gnat knew each other from Gnat's previous employment with Arrow, and that Garrity and Gnat shared hockey tickets with a group of five or more persons, but both denied jointly entertaining Barry. Moreover, Barry's own testimony is that Garrity continually tried to steal business away from Gnat and Milgray throughout the alleged kickback period, activity that is totally inconsistent with plaintiff's alleged conspiracy claim.

Plaintiff next argues that the kickback program had such a high degree of coordination between Arrow and Milgray that it defies coincidence. To support this argument, plaintiff points

---

[4]The court will assume for purposes of this motion that Barry so testified. Plaintiffs' record citation does not support the statement, and Gnat denied discussing Barry with Garrity.

to the fact that both before and after the "alleged scheme" Arrow had minimal sales to plaintiff. Again, however, this is equally consistent with an independent kickback scheme as it is with a conspiracy to restrain trade. Obviously, plaintiff's purchases from Arrow were reduced once plaintiff discovered that Barry was taking bribes for his business. Plaintiff's suggestion that this falloff in business leads to the conclusion of a conspiracy is implausible

According to plaintiff, however, the most striking evidence of collusion is the uniqueness of the bribery program instituted by Arrow and Milgray. Unlike the bribes paid by American Progress Circuits and Pro Components Inc., which were "traditional kickbacks" made by check after each order was placed, Arrow and Milgray paid a flat rate in cash at regular monthly intervals. The rate was tied to projected annualized volume of plaintiff's purchases. Both Arrow and Milgray reevaluated the payment program at midyear.

Although this evidence is slightly stronger than the rest of plaintiff's case, it certainly cannot be described as unambiguous. First, there is nothing unique about kickbacks being paid in cash. Indeed, the record reveals that Pro Components did pay some of its kickbacks in cash. Moreover, the manner in which the kickbacks were made could just as easily have been set by Barry as by Garrity and Slupik.

Finally, plaintiff argues that the similarity between Arrow's and Milgray's prices during the period leads to the inference of conspiracy. According to plaintiff, Arrow's and Milgray's prices "managed to come within pennies on their 'blind' bids to plaintiff." Plaintiff argues that no other supplier came even close to such pinpoint precision. Arrow's expert's testimony, however, is that "the data revealed no closer relationship between Arrow and Milgray in their pricing than among the other firms in this industry." For one type of eprom, Arrow's expert

14

testified that for two-thirds of the months covered Arrow and Milgray charged different prices, while Hallmark and Milgray charged the same price more than half the time.

Even if plaintiff is correct, parallel pricing alone is insufficient to support a Sherman Act claim. See Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 541 (1954). This is particularly true where, as here, plaintiff's employee had the ability to set the prices charged. The evidence in this instant case shows that Barry was willing to sell to any supplier that paid a bribe. This is as consistent with an independent competitive market as it is with a conspiracy to restrain trade. See Federal Paper Board Co., Inc. v. Amata, 693 F. Supp. 1376, 1380 (D. Conn. 1988). Nor is plaintiff helped by its argument that Arrow and Milgray not only reduced their prices in tandem immediately after Williams removed Barry, but that their prices immediately diverged. Again, even if true, this is equally consistent with a simple commercial bribery scheme with Barry in charge.

## 2. Legitimate business justification for actions

Neither Arrow nor Milgray has suggested that there is any "legitimate" business justification for Garrity's and Gnat's conduct in the sense that commercial bribery can never be "legitimate." Instead, they have argued that plaintiff's evidence is as consistent with a simple bribery scheme that does not support a charge of conspiring to restrain trade in violation of Section 1.

## 3. Evidence tending to exclude possibility of independent action

Because, as demonstrated above, the evidence of the existence of a conspiracy among Arrow and Milgray is ambiguous. Plaintiff may survive summary judgment only by offering

15

"evidence that tends to exclude the possibility that the defendants were pursuing . . . independent actions." Market Force, 906 F.2d at 1173-74. There is no evidence suggested by plaintiff that sufficiently refutes the possibility that Arrow and Milgray were independently bribing Barry, as were others, or were independently acquiescing to Barry's demands. Certainly, under either scenario defendants would be acting within their own economic self interest. Defendants' scenario offers a plausible and justifiable alternative interpretation of their conduct that rebuts the allegedly conspiracy. Id. Accordingly, Arrow's and Milgray's motion for summary judgment on Count III is granted.[5]

### 3. Count IV - Breach of Fiduciary Duty

In Count IV, plaintiff alleges that Arrow and Milgray participated in and induced Barry to breach his fiduciary duty to plaintiff.. Arrow and Milgray argue that the count should be dismissed because it is an equitable claim for which plaintiff has an adequate remedy at law. In support of this proposition, plaintiff cites National Union Fire Insurance Co. v. Wilkins-Lowe & Co., Inc., 29 F.3d 337, 341 (7th Cir. 1994), for its statement that a "third party who colludes with a fiduciary in committing a breach of the fiduciary's duty, and who benefits thereby, is under a duty of restitution to the beneficiary." That court also stated, however, that "liability may be premised upon a defendant's participation in a fiduciary's breach of trust." Id. Although a constructive trust may be an available remedy for a defendant's participation in a fiduciary's breach of duty, National Union does not stand for these defendants' asserted proposition that the claim is an equitable one unavailable without the absence of an adequate remedy at law. Indeed,

---

[5]Because the court has concluded that there is insufficient evidence of conspiracy to survive summary judgment, there is no need to address defendants' second argument regarding cognizable antitrust injury.

breach of fiduciary duty cases are governed, in part, by the substantive law of contracts, Cherney v. Soldinger, 299 Ill. App. 3d 1066, 1073 (1st Dist. 1998), and a third party who participates in a breach of a fiduciary's duty becomes directly liable to the aggrieved party. Village of Wheeling v. Stavros, 89 Ill. App. 3d 450, 454 (1st Dist. 1980). Accordingly, Arrow's and Milgray's motion to dismiss Count IV is denied.

### 4. Count VI -- Consumer Fraud

In Count VI, plaintiff charges Arrow and Milgray with violating the Illinois Consumer Fraud and Deceptive Trade Practices Act ("CFA"), (815 ILCS § 505/1 et seq. Arrow and Milgray argue that the count fails as a matter of law, because plaintiff is not a "consumer" within the meaning of the CFA, and plaintiff's claim fails to implicate any consumer-protection concerns.

To establish a claim under the CFA plaintiff must show: 1) a deceptive act or practice; 2) an intent by defendant that the plaintiff rely on the deception; and 3) that the deception occurred in the course of conduct involving a trade or commerce. In re: Albergo, 275 Ill. App. 3d 439, 448 (2d Dist. 1995). "Where the alleged deception involves two businesses which are not consumers, a deceptive act or practice is actionable under the CFA if the alleged deception involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." Id.

A "consumer" is defined as one "who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business before his use or that of a member of his household." 815 ILCS § 505/1(e). In the instant case, plaintiff purchased the components in question not for its own use, but to incorporate into its product for resale, and

17

therefore is not a consumer. Plaintiff must, therefore, offer evidence that the alleged deception involves the market generally or otherwise relates to consumer protection concerns. Plaintiff has offered no such evidence, and the court's review of the thousands of pages of materials presented has uncovered none. The mere fact that plaintiff's product may ultimately be sold to a consumer is too attenuated. See Stepan Co. v. Winter Panel Corp., 948 F. Supp. 802, 807 (N.D. Ill. 1996). Accordingly, because plaintiff cannot establish a "consumer nexus," Arrow's and Milgray's motion for summary judgment on Count VI is granted.

### 5. Count VIII--Accounting or Constructive Trust

In Count VIII, plaintiff seeks an equitable accounting of both Arrow's and Milgray's benefits from the alleged fraud and an imposition of a constructive trust on each defendant. Arrow and Milgray argue that the count should be dismissed because accounting and constructive trusts are remedies and not claims or causes of actions. The case Arrow and Milgray rely upon, 3 Com Corp. v. Electronic Recovery Specialists, Inc., 104 F. Supp. 2d 932, 942 (N.D. Ill. 2000), however, makes clear that Illinois law provides for a claim for accounting, the elements of which are generally the absence of adequate remedy at law and either a breach of fiduciary relationship, a need for discovery, fraud, or the existence of mutual accounts which are of a complex nature. Id. If the accounting claim is based on a breach of fiduciary duty, as is the instant case, no lack of adequate remedy at law need be alleged.

Because plaintiff has alleged all the elements of its claim for accounting, Arrow's and Milgray's motion to dismiss Count VIII is denied.

### 6. **Punitive Damages**

Finally, Arrow's and Milgray's motion to strike plaintiff's claims for punitive damages is denied. Arrow's motion (adopted by Milgray) is based on its claim that there is insufficient evidence that Arrow ratified Garrity's actions. This court has already rejected this argument in denying Arrow's motion for summary judgment on the RICO counts (I and II).

### B. **Linda Gnat – Motion for Summary Judgment**

The third amended complaint names Linda Gnat in Counts I and II (RICO), IV (breach of fiduciary duty), V (fraud), VI (CFA) and VIII (accounting and constructive trust), all of which are based on the allegation that Slupik and Linda's husband, Lawrence Gnat, were paying kickbacks to Barry for purchasing component parts from Microcomp, a company owned by Linda and Lawrence. Linda has moved for summary judgment on all counts, arguing that plaintiff has offered no evidence to establish that Linda participated in or had knowledge of the alleged fraudulent scheme.

Plaintiff alleges generally that Microcomp, through Lawrence Gnat, paid kickbacks to Barry in exchange for Barry placing orders with it. Linda Gnat was president of Microcomp throughout the period of time that the alleged fraud took place. Linda argues that plaintiff improperly seeks to hold her individually liable for the corporation's wrongdoing without evidence of her individual participation. See Prince v. Zazove, 959 F.2d 1395, 1401 (7th Cir. 1992).

Lawrence Gnat, Slupik, and nonparty Henry Sylwestrzak, all then employees of Milgray, formed Microcomp in 1985. Microcomp was a parts broker, specializing in obtaining hard-to-find parts, while Milgray was a distributor for manufacturers. Sometime in 1987, Milgray

became aware of Microcomp and Gnat's connection to it.[6] At that time Gnat met in New York with three members of Milgray's senior management to discuss Microcomp and Gnat's role in it. At that meeting, Milgray reviewed Microcomp's tax returns, corporate structure and types of parts that Microcomp was selling. Milgray told Gnat that he should not have any partners in Microcomp, could not become an officer of Microcomp and should never take any business away from Milgray. Milgray told Gnat to reduce his "visibility" in Microcomp. Gnat agreed.

As a result of Gnat's meeting with Milgray, Linda Gnat became president of Microcomp in 1987. To lower Lawrence Gnat's visibility, Linda used her maiden name, Benedyk, to run the business.

Microcomp entered into a consulting agreement with LG Consulting, run by Lawrence Gnat. LG Consulting received 15% of gross sales made on behalf of Microcomp, or 50% of Microcomp gross profits generated by LG Consulting. The LG Consulting bank account was a personal account to which Linda Gnat had full access.

Plaintiff does not contest Linda's assertion that plaintiff must demonstrate that she had some knowledge that her husband or Slupik was bribing Barry. It argues that the record contains both direct evidence in the form of deposition testimony, and circumstantial evidence to meet this burden. The court disagrees.

First, plaintiff has pointed to no deposition testimony that directly establishes that Linda was aware of the alleged bribes. She specifically denied having any knowledge, and Barry

---

[6]Lawrence Gnat bought out both Slupik and Sylwestrzak sometime in 1987, either immediately before or immediately after Gnat's meeting with Milgray in New York.

testified that he knew of nothing that would indicate Linda was aware that her husband was paying kickbacks for business.

Unable to come up with any direct evidence, plaintiff attempts to weave together an argument based on the fact that Linda used her maiden name, rather than Gnat, and allowed her husband and Slupik to sign her initials as the salesman on purchase orders. These facts, according to plaintiff, allowed Lawrence Gnat's fraud to prosper for four years.

While the facts stated above might indicate an attempt to deceive Milgray about Microcomp's business, none of these facts demonstrate that Linda was aware of the alleged bribery scheme, or participated in the fraud against plaintiff. This conclusion is strengthened by the fact that Linda began using her maiden name four years before Microcomp began selling any parts to plaintiff. This fact alone demonstrates that Linda's use of her maiden name was not used with the intent to prevent plaintiff (as opposed to Milgray) from discovering her husband's actions, as plaintiff suggests.

Accordingly, because plaintiff has offered no evidence that Linda Gnat was a participant in the fraud or the alleged inducement of Barry to breach his fiduciary duty to plaintiff, Linda's motion for summary judgment is granted on all counts.

## II. **Motions Regarding Milgray's Counterclaim and Cross-claims**

Milgray has filed a counterclaim against plaintiff, and cross-claims against Barry, Gnat, Slupik and Microcomp, charging Gnat and Slupik with fraud (Count I) and plaintiff, Barry, Gnat, Slupik and Microcomp with breach of fiduciary duty (Count II), tortious interference with business opportunity (Count III), common law fraud (Count IV), civil conspiracy (V) and, CFA

violations (Count VI). Count VII is brought solely against plaintiff for negligent supervision of Barry. Gnat, Slupik, Microcomp and plaintiff have moved for summary judgment on all counts.

## A. **Gnat and Slupik**

Gnat and Slupik each argue that Milgray has released all claims that they may have had against them when it terminated their employment and then entered into written severance agreements containing broad mutual general releases. Milgray claims that the releases were fraudulently induced by Gnat and Slupik.

As noted above, Gnat was hired as general manager by Milgray in 1984. Slupik worked for Milgray as a sales representative under Gnat. In 1985, Gnat, Slupik and Sylwestrzak started Microcomp. In 1987 Milgray learned of Microcomp, was concerned, and met with Gnat in New York. Gnat testified that he was told to not have any partners and to reduce his visibility in Microcomp, but was not told that he could not continue with Microcomp as long as he did not compete with Milgray. Milgray executives have testified that Gnat was told to quit Microcomp immediately. In either event, Gnat did not end his affiliation with Microcomp, but instead bought out Gnat and Sylwestrzak and made his wife president.

Ten years later, in 1997, Bell Industries (with whom Milgray was in the process of merging) received a call from plaintiff and learned about Microcomp and Gnat's affiliation with it, and that Microcomp was selling product to plaintiff. Robert Walker of Bell disclosed these facts to Thomas Woolf (regional manager at Milgray). Woolf had been at the 1984 meeting with Gnat regarding Gnat's involvement with Microcomp. Woolf was upset and annoyed about Gnat's continued involvement with Microcomp and told Walker, "I am going to fire him."

Walker told Woolf "no don't fire him, we're working with [plaintiff] in their investigation, and when we [Bell and Milgray] consolidate, we'll take care of the problem."

Two months later, on March 31, 1997, Woolf met with Gnat and terminated him effective as of that date. Woolf handed Gnat a written severance agreement, and told him he had to sign it if he wanted any severance pay. He then suggested that Gnat review it with a lawyer or an accountant. Gnat reviewed it with his accountant, and then requested a greater amount of severance pay, to which Milgray agreed. Gnat changed the agreement, signed it and sent it to Milgray. Woolf then signed it for Milgray. The agreement contains a very broad mutual general release:

> 2. **MUTUAL RELEASES**. Subject only to the performance of the obligations set forth in this agreement, the parties hereby release and forever discharge each other, their respective successors and assigns from any and all claims, sums of money, debts, liabilities, demands, obligations, costs, expenses, and causes of action of every kind, nature, and description whatsoever, whether known or unknown, contingent, absolute, or otherwise, which either of said parties now holds or at any time heretofore has held against the other, to the date of this agreement. In entering into the releases set forth herein, the parties mutually waive the provisions of California Civil Code Section 1542, which provides as follows:

>> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

> Or any similar statute, law, rule, or regulation applicable in the State of Illinois.

> It is expressly understood and agreed that the possibility that any unknown claims exist was explicitly taken into account by each of the parties in determining the amount of consideration to be paid for the giving of the releases contained herein, and a portion of such consideration, having been bargained for between the parties with the knowledge of the possibility of the existence of such unknown claims, was given in exchange for a full accord, satisfaction and discharge of all such claims.

Slupik was terminated on April 11, 1997. At the time of his termination he was handed a check containing a memorandum stating "terminated 4/11/97." Two days later, he wrote to John Tortorici of Milgray arguing for a greater severance payment and complaining of age discrimination. On April 22, 1997, Slupik and Tortorici signed a Bell Severance Agreement approved by Bell's lawyers. The Slupik agreement contains the exact same mutual general release as contained in the Gnat agreement.

There is no question, and thus Milgray does not argue otherwise, that the terms of the mutual general releases cover Milgray's claims against Gnat and Slupik. Thus, if the agreements are valid, the claims have been waived. Milgray argues that the court should rescind the agreements because of Gnat's and Slupik's failure to disclose their dealings with Microcomp prior to executing the agreements. See Allstate Financial Corp. v. Utility Trailer of Illinois, Inc., 936 F. Supp. 525, 529 (N.D. Ill. 1996) (if fiduciary relationship exists between the contracting parties, a duty to disclose material information exists and a party's breach of this duty is considered the same as a false statement).

There are two problems with this argument. First, as Gnat argues, the evidence unequivocally demonstrates that the agreements were negotiated and executed after Gnat and Slupik had been terminated. Once terminated, any fiduciary relationship and concomitant duty to disclose ended. See Dames & Moore v. Baxter & Woodman, Inc., 21 F. Supp. 2d 817, 823 (N.D. Ill. 1998).

Moreover, and perhaps more important, Milgray cannot establish justifiable reliance on any alleged omission. To establish that the agreements were entered fraudulently, Milgray must establish the elements of fraud, including misrepresentation of a material fact and reasonable

reliance on the misrepresentation. <u>Allstate</u>, 936 F. Supp. at 528. At the time it entered into the agreements containing the general releases insisted upon by it, Milgray knew of Microcomp, and Gnat's involvement with it. It knew enough that Woolf wanted to terminated Gnat, but was told not to do so. It was apparently investigating, but failed to raise the issue with Gnat or Slupik. Woolf testified that when he terminated Gnat he could have asked about Microcomp, but was under directions not to bring it up. It "was Milgray's and Bell's choice not to ask questions of Mr. Gnat concerning Microcomp."

To be actionable, "fraud must induce reliance - - must in other words be both believed (if it is not believed, it can hardly be described as fraud) and acted on." <u>Sain v. Nagel</u>, 997 F. Supp. 1002, 1014 (N.D. Ill. 1998) (quoting <u>Ampat/Midwest Inc. v. Illinois Tool Works, Inc.</u>, 896 F.2d 1035, 1041 (7th Cir. 1990)). The victim of a fraud cannot close his eyes to a known risk and he cannot close his eyes to a risk that is obvious. <u>Id</u>. To decide whether a party to an agreement justifiably relied on a material omission, courts look to all the circumstances surrounding the transaction, including the parties' relative knowledge of available facts, the opportunity to investigate the facts, and prior business experience. <u>Id</u>. at 1015.

In the instant case, the undisputed evidence demonstrates not that Milgray relied on any omission, but that it knew Gnat and Slupik were omitting what Milgray deemed material, and elected to ignore (and in fact avoid) that omission. Under these circumstances, Milgray cannot establish justifiable reliance, and the agreements are valid. All claims against Gnat and Slupik have been released. Accordingly, Gnat's and Slupik's motions for summary judgment on Milgray's cross-claims are granted.

## B. <u>Williams and Microcomp</u>

Williams and Microcomp argue that Milgray's release of Gnat and Slupik operates to release all joint tortfeasors. "At common law, the unconditional release of one of two or more joint tortfeasors releases the other tortfeasors, even though the latter were not a party to the release or specifically identified in the release unless a contrary intent appeared from the face of the instrument." <u>Cherney v. Soldinger</u>, 299 Ill. App. 3d 1066, 1070 (1st Dist. 1998) (citing <u>Porter v. Ford Motor Co.</u>, 96 Ill. 2d 190, 195 (1983). "The common law rule applied not only to those who were technically joint tortfeasors, but to wrongdoers whose conduct produced the same single injury." <u>Id</u>. The rule is also applied outside the scope of the tort area to co-obligors on a contract. <u>Id</u>. Thus, under common law, all of Milgray's claims against Williams and Microcomp were released when Milgray released Gnat, because the claims all produced the same single injury. <u>Id</u>.

Milgray argues that the common law rule has been "upended" by the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/2(c), which provides:

> When a release or covenant not to sue or not to enforce judgment is given in good faith to one or more persons liable in tort arising out of the same injury or the same wrongful death, it does not discharge any of the tortfeasors from liability for the injury or wrongful death unless its terms so provide . . . .

The provisions of the Act do not apply, however, where liability is predicated on upon a breach of fiduciary duty. <u>Cherney</u>, 299 Ill. App. 3d at 1071 (citing <u>American Environmental Inc. v. 3-J Co.</u>, 222 Ill. App. 3d 242, 247 (1991). "By its own terms, section 2(c) of the Act governs releases given to "persons liable in tort" for the same injury. <u>Id</u>. The Act was intended only to abolish the rule that produced an involuntary discharge of "joint tortfeasors." <u>Id</u>. The Act does

not direct itself to co-obligors, persons liable in contract, or to wrongdoers liable under any theory other than tort," all of which are covered by the common law.  Id.

Moreover, the Act only covers certain tortfeasors.  Intentional tortfeasors, such as those liable for fraud as alleged in the instant case, are not entitled to contribution under the Act, and thus § 2(c)'s provisions on releases is not applicable.  See Gerill Corp. v. Hargrove, 128 Ill. 2d 179, 206 (1989).  Therefore, § 2(c) does not apply to Milgray's claims against Microcomp and Williams.  Accordingly, the release of Larry Gnat and Slupik released Williams and Milgray, and Microcomp's and Williams' motions for summary judgment on Milgray's counterclaim and cross-claims are granted.

## III.  Motions Regarding Affirmative Defenses

Williams has moved for summary judgment on certain affirmative defenses raised by Arrow, Milgray, the Gnats and Microcomp.[7]

### A.  Statute of Limitations/Laches

Arrow has argued that some or all of plaintiff's claims may be barred by the applicable statute of limitations or by laches.  Plaintiff argues that because the fraud continued until 1996 and suit was filed in 1997, no claim is so barred.[8]

Arrow argues first that when harm is caused by separate acts (as opposed to a continuing problem), the statute of limitations runs anew for damages caused in each instance of wrong-doing.  Gass v. Metro East Sanitary District, 186 Ill. App. 3d 1077, 1087 (5th Dist. 1989).

---

[7]Because Arrow has taken the lead on these arguments, the court will refer to the defenses brought by Arrow in its discussion.

[8]The parties appear to agree that the relevant limitation periods for plaintiff's state and federal claims range from three to five years.

Additionally, Arrow argues that the "continuing violation" doctrine applies only to nuisance or trespass, not fraud. See Hertel v. Sullivan, 261 Ill. App. 3d, 156, 161 (4th Dist. 1994).

For fraud cases, Illinois follows the discovery rule. Knox College v. Celotex Corp., 88 Ill. 2d 407 (1981). This rule provides that the "limitations period does not begin to run until there exists actual or constructive knowledge" of both an injury and that someone may be at fault for its existence. Cary v. Kerr-McGee Chemical Corp., 999 F. Supp. 1109, 1115 (N.D. Ill. 1998). At that time, the burden is placed on the injured party to inquire as to the existence of a cause of action. Id. A determination of the point in time that the limitation period commences is most often a jury question. Id.

In the instant case, there is evidence that plaintiff was put on notice of the potential for bribes as early as 1990, when Larry Suida told his supervisors that he had been offered a bribe by an Arrow representative. A jury could infer that from that point on plaintiff was aware that Garrity was "dirty" and should have investigated when purchases from Arrow increased dramatically. Moreover, Kim Walman, plaintiff's vice president for purchasing and material control, testified that in 1994 rumors ran rampant that plaintiff's buyers were accepting gratuities from vendors. This evidence is sufficient to raise a question of fact as to if and when plaintiff had knowledge of Barry's activities. Accordingly, plaintiff's motion for summary judgment on the statute of limitations and laches defenses is denied.

### B. Ratification

Plaintiff argues that there is no evidence that plaintiff ratified Barry's fraud. The Suida testimony, however, is sufficient for a jury to conclude that plaintiff authorized Barry's conduct that it now denounces as fraud, either by knowing exactly what he was doing, or by choosing to

turn a blind eye to it. <u>Eastern Trading Co. v. Refco, Inc.</u>, 229 F.3d 617, 625 (7th Cir. 2000).

Accordingly, plaintiff's motion for summary judgment on ratification is denied.

## C. Extortion

Arrow has asserted an extortion defense, maintaining that plaintiff's claims are barred because Barry refused to do business with Arrow unless he received a kickback. <u>Citing U.S. v. George</u>, 477 F.2d 508 (7th Cir. 1973), plaintiff argues that there is no evidence of extortion. Garrity testified that Barry approached him about kickbacks. Moreover, Barry testified that it was "mere coincidence" that salesmen from seven different vendors all approached him at approximately the same time about paying him kickbacks. A reasonable jury could reject this testimony as implausible, and conclude, as plaintiff's original complaint charged, that Barry was the one making demands. <u>See Kraft General Foods, Inc. v. Cattrell</u>, 18 F. Supp. 2d 280, 283 (S.D. N.Y. 1998). Accordingly, plaintiff's motion for summary judgment on extortion is denied.

## D. Failure to Mitigate

Finally, Arrow argues that plaintiff has failed to mitigate its damages. Plaintiff argues that this defense is akin to contributory negligence which is not a defense to fraud. <u>Refco</u>, 229 F.3d at 624. In Illinois, however, the doctrine of mitigation of damages "applied in virtually every type of case in which recovery of a money judgment or award is authorized." <u>Culligan Rock River Water Conditioning Co. v. Gearhart</u>, 111 Ill. App. 3d 254, 258 (2d Dist. 1982). Arrow's mitigation claim is based on its assertion that plaintiff turned a blind eye to Barry's alleged activity. Because that is a factual question, plaintiff's motion for summary judgment on the defense of failure to mitigate damages is denied.

### E. In Peri Delicto; Unclean Hands; Equal Involvement

Plaintiff has moved for summary judgment on Arrow's common law defenses of in peri delicto, unclean hands, and equal involvement. The three defenses, which are similar in nature, are all based on Arrow's claim that plaintiff knew of or turned a blind eye to Barry's receipt of kickbacks.

The equitable defense of in peri delicto or "in equal fault," is rooted in the common law notion that a plaintiff's recovery may be barred by his own wrongful conduct. Pinter v. Dahl, 486 U.S. 622, 632 (1988). Traditionally, the in peri delicto defense was limited to situations were the plaintiff bore at least substantially equal responsibility for its injury, and where the parties' culpability arose out of the same illegal act. Id. Contemporary courts have expanded application of the defense to situations more closely analogous those encompassed by the "unclean hands" doctrine, where the plaintiff has participated in some of the same sort of wrongdoing as the defendant. Id. (citing Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 138 (1968)). In Perma Life, the Court concluded that such a broadened construction should not be applied to litigation arising under federal regulatory statutes, concluding (in a plurality opinion) that a narrow, more traditional formulation should apply to private actions under the antitrust laws. Perma Life, 392 U.S. at 145.

"Unclean hands," a companion principle to in peri delicto, In re Olympia Brewing Co. Securities Litigation, 1985 WL 3928 at *3 (N.D. Ill. Nov. 13, 1985), prevents a party from obtaining equitable relief if he himself has engaged in misconduct. See Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814-15 (1945). As the Seventh Circuit has noted, an unjust enrichment claim or other equitable relief is denied to a

plaintiff whose recklessness caused his claimed injury. "If the unclean hands defense tells us one thing, it is that equity does not find a benefit unjust where a plaintiff, through his own misconduct, intentionally places himself at risk. TRW Title Insurance Co. v. Security Union Title Insurance Co., 153 F.3d 822, 829 (7th Cir. 1998).

"Equal involvement" is the name given to the narrow in peri delicto defense recognized in Perma Life, and later extended to securities actions in Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306-11 (1985). "The equal involvement defense is more demanding of those asserting it than the in peri delicto defense and only bars the claims of a plaintiff who truly bore at least substantially equal responsibility [as the defendant] for the violation of the federal law at issue." Roma Construction Co. v. aRusso, 96 F.3d 566, 582 (1st Cir. 1996) (Lynch, J., concurring) (quoting Bateman Eichler, 472 U.S. at 308).

Arrow's assertion of all three of the defenses relies on its claim that at some point plaintiff either became aware of Barry's activities, or turned a blind eye to it. Larry Suida's testimony that he told the vice president of purchasing that Arrow offered him a bribe, coupled with the dramatic increase in business with Arrow once Suida left, raises a question of fact on this issue. Accordingly, plaintiff's motion for summary judgment on the in peri delicto, unclean hands, and equal involvement defenses is denied.

**F. Assumption of Risk**

Finally, Microcomp has asserted assumption of risk as an affirmative defense. Because assumption of risk is a defense to negligence claims, not intentional torts, plaintiff's motion for summary judgment on this defense is granted. McGill v. Duckworth, 944 F.2d 344, 352 (7th Cir. 1991), overruled on other grounds, Farmer v. Brennan, 511 U.S. 865 (1994).

31

## CONCLUSION

For the reasons set forth above, Arrow's motion for summary judgment on RICO, consumer fraud, inducement of breach of fiduciary duty, constructive trust, and punitive damages is granted as to plaintiff's consumer fraud claims, and denied in all other respects. Milgray's motion for summary judgment on consumer fraud, inducement of breach of fiduciary duty, accounting and constructive trust is granted as to consumer fraud and denied in all other respects. Arrow's and Milgray's joint motion for summary judgment on price fixing is granted. Linda Gnat's motion for summary judgment on all counts is granted.

Lawrence Gnat's and Microcomp's motion for summary judgment as to Milgray's cross-complaint is granted. Richard Slupik's motion for summary judgment as to Milgray's cross-complaint is granted. Plaintiff's motion for summary judgment as to Milgray's counterclaim is granted.

Plaintiff's motion for summary judgment on certain affirmative defenses is denied as to ratification, extortion, in peri delicto, unclean hands, equal involvement, mitigation of damages, statute of limitations, and laches, and granted as to assumption of risk.

This matter is set for a status report on September 26, 2001, at 9:30 a.m., at which time the court will set a trial date.

**ENTER:**     **September 17, 2001**


**Robert W. Gettleman**
**United States District Judge**